Robert K. Schwarz (Cal. Bar No. 202293)
Email: robert@hiddenvalleylaw.com
SCHWARZ LAW FIRM
28202 Cabot Rd., Suite 300
Laguna Niguel, CA 92677
Telephone: (949) 365-5752
Facsimile: (949) 365-5061

Attorney for Defendant
NICHOLAS JOSEPH CHELINI

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. SA CR 19-070-AG |
| ) | |
| Plaintiff, ) | |
| v. ) | **DEFENDANT'S SENTENCING** |
| ) | **POSITION** |
| NICHOLAS JOSEPH CHELINI, ) | |
| ) | HEARING DATE: January 29, 2020 |
| Defendant. ) | HEARING TIME: 9:00 a.m. |
| _____ ) | |

## I.  INTRODUCTION

Mr. Chelini respectfully submits that a sentence of no more than 32 months is sufficient, but not greater than necessary, to achieve the purposes of sentencing. On September 30, 2019, the Court accepted Mr. Chelini's guilty plea to Count Three of the Superseding Indictment (18 USC § 1951(a) (Hobbs Act robbery)).

## II.  DISCUSSION OF § 3553(a) FACTORS

*Losing Balance*

Six-year-old Nicholas Joseph Chelini (Nick) heard a blood curdling scream. In the front yard of his two-story home in Temecula, California, Nick had been

tossing a football to a friend. It was an ordinary weekend in the Chelini family, which typically included sleepovers with friends, neighborhood barbecues, pool parties, and riding dune buggies for recreation. Life was good.

Feeling a wave of alarm, Nick ran toward the shouting. His father was on the ground writhing in pain. Nick glimpsed at his father's big lift truck, a wash bucket, sponges, and a tall ladder. His father must have been washing his truck. He must have fallen off the ladder. His father needed help. Nick sprinted toward the house to find his mother.

As a successful businessman, Nick's father owned a local car dealership. His injured leg was treatable; though unfortunately, Nick's father became addicted to the painkillers. Eventually, he advanced to stronger narcotics. And in an instant, young Nick along with his two sisters, baby brother, and his mother's lives were altered in irreparable ways.

Nick's thriving and happy family began to crumble. His parents began to bicker. Soon their arguments escalated to screaming. Nick felt rattled to his core. He states, "Things were not the same. My parents were always fighting. I hated when people fight. It scared me."[1]

To make matters worse, Nick was already struggling in school. Class assignments seemed overwhelming. After being tested, Nick was placed in a special education program. According to his mother, Bridgett, when Nick "was

---

[1] Unless otherwise noted, quotations are from Nick's life story prepared for counsel.

2

in the first grade, he was diagnosed with ADHD and was placed on medication." (01/10/20 investigator's memo of Bridgett Duncan's interview.)  The school's "psychologist diagnosed Nick with the following learning disabilities: oppositional defiant disorder, visual processing and listening and learning comprehension." (*Id.*)  Though it cannot be known for certain, Nick's issues may have stemmed from suffering a concussion at two years old when "he fell and hit his head and started vomiting" or when he was five and "almost drowned in the Jacuzzi." (*Id.*)  Even with all of these disadvantages, one of his teachers still describes Nick as being a "great asset for other students.  He would often guide students to learn from staff and not to make bad choices like drugs, alcohol, or fighting." (Susan Krogsdale Letter of Support; Exhibit 1.)

Growing up, Nick had a strong desire to be helpful to others.  He wanted peace in his family.  All he wanted was to recapture the happiness he had prior to his father's addiction and self-destruction.

### *Losing Control*

At an age when young boys are looking for role models and learning what it means to become a responsible adult, Nick's most important male influence – his father – abdicated that duty.  For example, Nick watched his intoxicated father nearly drive their RV off a cliff.  On another occasion, he observed his father lose control and violently shove his mother into a bathtub.  When Nick came to his mother's defense, his father hit him too.  Tearfully, Nick saw his parents' brawl move to the front yard of the house (in full view of their

neighbors), culminating in his father recklessly back his large lift truck out of the driveway and strike another vehicle. The wake of the fight left behind physical and deep emotional bruises.

Nick later found himself thrown into a fierce and lengthy custody battle. He also became a target of his father's physical abuse. He describes this period as "the worst time of my life. Because I would now see my dad doing drugs."

Nick's sister, MacKenzie, supports his observations. She describes their father as a "belligerent drunk." (01/10/20 investigator's memo of MacKenzie Chelini's interview.) Furthermore, she goes on to state that "[h]er dad and his wife, Lisa Schultz, would spend hours in the garage and when they'd come out, they'd scream and yell at each other, and at times their arguments turned physical." (*Id.*) MacKenzie relates how she would "go in the garage [and] find numerous pieces of tin foil . . . ." [The implication (of course) is that Lisa and her father were doing heroin in the garage.]

These violent family episodes frightened Nick, causing him to feel alone and insecure. MacKenzie noted, "Nicholas was scared at night and slept with his air gun." Bridgett added that Nick would also "sleep with a butcher knife and a screw driver next to him." (01/10/20 investigator's memo of Bridgett Duncan's interview.)

Nick wanted to feel safe. He wanted the grownups in his life to protect him. In contrast, young Nick continued to wade through uncertainty and fear.

4

He wondered if the happy times that he remembered so clearly would ever return.

### *Lost Dreams*

As Nick grew older, he began to struggle behaviorally. At times he would fight and argue with his classmates and teachers. One of his instructors, Susan Krogsdale, states, "As an 8th grader, he physically looked like he was 18 years old. I think this added to his difficulty . . . adults who did not know him, expect[ed] him to make decisions that were more mature." (Susan Krogsdale Letter of Support; Exhibit 1.)

As Nick's behavioral issues grew, his academic issues also continued to plague him, which likely contributed to the same. "Nick Chelini's IQ according to our testing ranged from the lowest of 61 to the highest of 71. At 70 a person is considered to be Limited Intellectual Functioning," says Susan. (*Id.*) Nevertheless, Nick's "adaptive ability, 'street smarts' or social ability" was age appropriate. (*Id.*) This one saving grace gave Nick the ability to adapt and motivate others. It also contributed to his strong desire to help others. All of which instilled in Nick a lifelong goal of becoming a Marine.

His grandfather, Walt Dodge, attests to Nick's helpful nature. Speaking of Nick, Walt states, "Many times he would befriend someone who was experiencing challenges at home and in life. It almost seemed that he would gravitate toward those that needed help more than those that didn't. I [Walt] asked him why this was so often the case and his reply was that he had been

through a lot in his life. If he could help others through his experiences, it was a better use of his time than wasting it on those whose lives were perfect and didn't need help." (Walt Dodge Letter of Support; Exhibit 2.)

Nick was determined. By becoming a Marine, he could help those who needed protection. He could become a role model and counselor to those needing guidance. He could become all the things he wanted during his growing up years. He could make a difference in someone else's life.

Sadly, as time moved forward, Nick soon learned that his dream would not be realized. Once again, his sister MacKenzie recalls, "[Nick] always wanted to be in the Marines and help protect others, and I know when that wasn't able to happen it affected him emotionally. I don't know any of the people involved in this case, but when I heard that two of them were in the Marines I knew that Nick would do whatever he could to be accepted into that group." (MacKenzie Chelini Letter of Support; Exhibit 3.)[2]

Treading his way through all of these difficulties, Nick needed guidance – a positive role model. Instead, from childhood and on into his young adulthood, Nick was cast about between distracted or absent parents. At one point he did not see his father for over six years. Yet one fateful visit with his father would

---

[2] For economy (especially due to the advanced sentencing date), the remaining letters of support not specifically quoted herein are attached as Exhibit 4, Nick's letter to the Court is attached as Exhibit 5, and family pictures are attached as Exhibit 6.

6

place a burden of guilt on Nick that would bother his conscience for years to come.

### *A New Chapter*

That night, Nick and his younger brother were staying with his father and his then new girlfriend, Lisa. His father and Lisa were fighting. The angry shouts rose to a degree that it frightened Nick (even though by this point Nick had seen plenty of fights). The more intense, hostile and combative the argument became, the more Nick felt unraveled. He didn't know what to do. He called his mother.

He recalls this time regretfully. "My mom showed up with my sisters and her boyfriend and his friend . . . . [They] ran up in the house and beat the s\*\*t out of my dad. I was the only kid who watched it all . . . . The thing that really messes me up to this day is that I am the reason that happened to my dad. I should not have called my mom . . . . [It] just shows how much I hate people fighting."

Similar to many children of divorced parents, Nick took responsibility for his parents' imprudent actions. And although the burden on his conscience is unjustified, it demonstrates the nature of Nick's disposition. It makes evident that he is not one to blame others, but instead, to put the blame on himself.

These traumatic events made a heavy impression on a young boy who was trying to find his place in the world. Yet despite everything, Nick does NOT assign ANY of the responsibility of his criminal conduct on his parents or the

7

difficult circumstances of his childhood or young adulthood. He readily admits, "My decisions have been based on fear, pride or ego. As a result, these decisions have led me down a path of self-destruction. Today, I try to allow God to guide me on the road to sanity. I am responsible for my actions, whatever the consequences."

### *Other Factors*

Again, Nick understands that his troubled upbringing, mental health issues, lack of intellectual functioning and his severe addiction do not excuse his conduct; this Court is, however, permitted to take it into account when it decides the appropriate sentence to impose. *See e.g.*, *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J. concurring) ("evidence about the defendant's background and character are relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse.").

What is more, Nick has accepted responsibility and he knows that he must be punished for the instant offense. Nevertheless, the Court should take into consideration two important points: First, the probation officer recognized that there are mitigating factors present in this case that are not "fully captured by the guidelines, which are believed to have contribute[d] to [his] participation in the offense." (ECF 187 at 7.) The probation officer recommended what amounts to a two-level downward departure and the low-end of the adjusted guideline

range or 37 months. (*Id*.) Second, despite the government's argument to the contrary, a sentence of anything more than 37 months **would** (in fact) constitute an unwarranted sentencing disparity.

The government argues that even though the Court sentenced co-defendant Matthew Hetrick (Hetrick) to 37 months, the Court should sentence Nick to the low-end of the guideline range because "Hetrick acted as a driver during the conspiracy and did not play a leadership role [and he] presented different, but compelling, mitigating circumstances." (ECF 192 at 8-9.) The Court should reject this contention because it omits the circumstances and arguments it (i.e., the government) set forth with respect to Hetrick's sentencing.

To begin, the government will often use the calculated guideline range "as a reasonable proxy for the perceived severity of the crime[s]." *United States v. Grob*, 625 F.3d 1209, 1218-1219 (9th Cir. 2010) (internal quotation marks omitted). Here, Nick and Hetrick's guideline ranges are roughly equivalent. In fact, Hetrick's is HIGHER than Nick's despite the two-level role enhancement. (*See e.g.,* ECF 167 at 3, ls. 17-18 (Hetrick's guideline range is **51-63**; Nick's is **46-57** (ECF 188 at 3)).) Moreover, though the government contends that following the probation officer's recommendation (of 37 months) would create disparity, the government actually argued that Hetrick receive a HIGHER sentence than what it is recommending in the instant case. The government recommended Hetrick receive **48** months prison (ECF 167 at 11, ls. 8-9) whereas the

government recommends Nick receive a **46**-month sentence (ECF 192 at 9, ls. 5-6).

As previously noted, in an effort to further justify why Hetrick should receive a lower sentence than Nick, it stated, "Hetrick presented different, but compelling, mitigating circumstances." (ECF 192 at 9, ls. 1-2.) However, three of the reasons it advanced to support its sentencing recommendation in Hetrick's case are equally applicable herein: First, the government stated, "Heavy drug use likely contributed to defendant's criminal conduct." (ECF 167 at 10, ls. 24-25.) Nick's substance abuse issues are well-documented in the PSR and the probation officer opined that Nick's "untreated substance abuse history . . . contribute[d] to Chelini's participation in the offense." (ECF 188 at 15-16; ECF 187 at 7.) Next, the government asserted, "It appears [Hetrick] has a strong support system . . . ." (ECF 167 at 10, l. 25 -11, l. 1.) Nick likewise has a strong support system as evidenced by the numerous letters of support attached to this memo. The government finally explained its recommendation by noting Hetrick "quickly accepted responsibility for his conduct after indictment." (ECF 167 at 11, ls. 3-4.) Nick also accepted responsibility quickly. For example, Hetrick was arraigned on April 29, 2019, and pleaded guilty 112 days later on August 19, 2019. (ECF 25 & 137.) Nick was arraigned on June 6, 2019, and pleaded guilty 116 days later on September 30, 2019 – a difference of only **four** days. (ECF 65 & 144.) Accordingly, in order to avoid an unwarranted sentencing disparity under 18 USC § 3553(a)(6), the Court should vary by at least as much as it did

for Hetrick or 14 months from the bottom of the guideline range and sentence Nick to no more than 32 months – a sentence that is fair and just and serves the societal needs of punishment and deterrence.

### III. CONCLUSION

For all the foregoing reasons, the defense respectfully submits that a sentence of not more than 32 months is the appropriate disposition herein.

DATED: January 21, 2019　　　　　　　　Respectfully submitted,

SCHWARZ LAW FIRM

By /s/_____
ROBERT K. SCHWARZ
Attorney for Nicholas Joseph Chelini